THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* RAMÓN RUIZ, Defendant and Appellant.

No. 8730. Argued May 7, 1941.—Decided May 20, 1941.

642

*Frank Torres* for appellant. *George A. Malcolm, Attorney General* and *R. A. Gómez, Prosecuting Attorney,* for appellee.

MR. JUSTICE TRAVIESO delivered the opinion of the Court.

Ramón Ruiz, the appellant, and Marcelino Piazza, were jointly charged with murder in the first degree committed when they illegally killed Pedro Serrano González on July 11, 1936. Piazza was arrested on August 4, 1936, and Ruiz on the 19th of September of the same year. The district attorney filed information against both of them on January 13, 1937, and the trial was set for March 30, 1937. On March 23, 1937, the defendants requested the dismissal of the prosecution for a violation of Section 448 of the Code of Criminal Procedure; the district attorney consented and the court so ordered, without prejudice to the district attorney to file a new information.

On March 29, 1937, the prosecuting attorney filed new information, the defendants were arraigned on April 2, and the hearing was set for June 7, 1937, on which day it was held.

On June 1, six days before the date set for the trial, the defendants requested the dismissal of the new information,

based on the fact that more than 120 days had elapsed from the day of the arrest of the defendants to the date of filing the new information, and that the order of dismissal of the first information "does not specifically authorize the district attorney to file a new information." The said motion was denied, and the case tried; the jury rendered a verdict of not guilty as to Piazza, and found Ruiz, the appellant, guilty of murder in the second degree. The court sentenced him to twelve years in prison.

The defendant appellant alleges that the court *a quo* erred in denying the motion for dismissal of the information; when the trial judge did not disqualify himself; in usurping the prerogatives of the jury through his instructions and in denying the motion for new trial. The defendant also alleges that the verdict is contrary to the evidence and the law.

The first assignment of error absolutely lacks merits. After the first information was dismissed, for having been filed after the term of sixty days from the date the defendants were arrested had elapsed, the district attorney was at liberty to file a new information, because the crime involved was a felony, as provided by Section 452 of the Code of Criminal Procedure, and the previous and express authorization of the court was not necessary. *People* v. *Pagán,* 23 P.R.R. 770. The second information having been filed on March 29, 1937, and the trial having been held on June 7, 1937, it is evident that the provisions of Section 448 of the Code of Criminal Procedure were strictly complied with, since the period of 120 days within which the trial must be held, should be counted from the presentment of the information and not from the date of the arrest, as the appellant erroneously pretends.

Let us examine the incident on which the second assignment of error is based. It appears from the instructions given by the judge to the jury that the defendant Maximino Piazza came to the district jail in the night of

the crime, declaring that he had killed Serrano, and that the following day, which was a Sunday, in the morning, Piazza was taken by two detectives to Mr. Todd, Jr., District Judge, because at that moment there was no other judge or judicial officer who could fix the provisional bail and said judge ordered his arrest and fixed bail. It also appears that since the detectives told the judge that Piazza had issued a statement, the judge took the proper oath.

None of the facts and circumstances that we have related incapacitated Judge Todd, Jr. to try the case, nor imposed on him the obligation to disqualify himself. Section 23, paragraph 3, of the Code of Civil Procedure, imposes on the judge the obligation to disqualify himself when he has been attorney or counsel to either party in the action or proceeding pending before his court "or *fiscal* in an investigation or criminal proceeding where the facts are the same as in the action submitted for his decision."

According to Sections 12 and 13 of the Code of Criminal Procedure, district judges are magistrates "with power to issue a warrant for the arrest of a person charged with a public offense." Section 44a of the same code provides that "in all warrants of arrest the amount of bail shall be fixed and said bail may be taken and admitted by any judge"; and Sections 32, 33 and 44 acknowledge the right that every person charged with the commission of a felony has to be taken without delay before a judge and that he should fix bail.

We hold that the actions of Judge Todd, Jr., complied with the most strict fulfillment of his duties as judge; that at no moment did he act as prosecuting attorney and that he did not err in any manner when he acted as trial judge in this case.

■ To sustain the alleged usurpation of the powers of the jury by the judge, appellant limits himself to point out in his brief three paragraphs of the instructions given by the judge, in which he makes a summary of that testified by

various witnesses, but he does not tell us in what consists, in his opinion, the alleged usurpation. We have studied said paragraphs in relation with the careful study that we have made of all the evidence, and we find that the statement·made by the judge is sustained by the record and is clear, just and reasonable. The judge limited himself to explain what had been stated by the witnesses of both parties without giving any opinion, and expressly telling the jury that it was to them to whom pertained "to determine as to the credibility of all the evidence." There was no error.

The motion for new trial, of whose denial the appellant complains, was based on the first and third assignments of errors which we have already discussed and dismissed and in the alleged discovery of new evidence consisting in the testimony of five witnesses, to the effect that they heard Maximino Piazza when he said that he had killed Serrano.

Section 303 of the Code of Criminal Procedure and the run of decisions demands, in order that a motion for new trial based on the discovery of new evidence may prevail, that it be stated under oath that the necessary steps were taken to acquire said evidence before the trial, and also that the efforts made be specified, in order that the court may appraise whether the defendant employed a reasonable activity to obtain such evidence. *People* v. *Díaz alias Martillo,* 5 P.R.R. 197 (2d ed.); *People* v. *Milán,* 7 P.R.R. 442; *People* v. *Otero,* 11 P.R.R. 330; *People* v. *Viader,* 23 P.R.R. 672, and *People* v. *Mauleón,* 50 P.R.R. 545. The motion filed in this case does not comply with that express requisite. The defendant has not made any allegation tending to convince the trial court that it was impossible to obtain the evidence offered as new before the trial.

The new evidence offered in support of the motion for new trial was cumulative, for it had to do with facts narrated by other witnesses in the trial. When the evidence is of a cumulative nature, the court has discretion to admit it.

It has not been shown that the court has abused that discretion. *People* v. *Lebrón*, 23 P.R.R. 611; *People* v. *Pujols*, 23 P.R.R. 818; *People* v. *Quiles*, 41 P.R.R. 904. Also, as the motion for new trial was not sworn, the court acted correctly in denying it, according to what was decided in *People* v. *Muñoz*, 25 P.R.R. 192.

■■ The appellant alleges that the last assignment of error—"that the verdict is contrary to the law and the evidence"—is sustained by the testimony of the detectives Modesti and Díaz Casiano, to whom Piazza confessed that he had committed the crime.

The evidence offered by the district attorney to sustain the charge was the following:

The doctor who performed the autopsy on the corpse of Pedro Serrano testified that Serrano died as the direct consequence of a bullet wound. The bullet perforated the right zygomatic region and was lodged in the encephalic mass.

Cosme Andújar and Santiago Serrano, who worked with the defendant, identified the revolver caliber 32, which was used to kill the deceased, as of his property.

Eleuterio Hernández, agent of the Bureau of Criminal Investigation, testified that he examined the revolver, caliber 38, which was found in the house of the defendant Ruiz, under the pillow of his bed, and said that it was impossible to determine the date when the last shots were made; that he examined the other revolver, caliber 32, that the district attorney delivered to him, and was able to confirm that it was fired, and that the bullet with which Serrano was killed, was fired with that revolver. He further testified that he made the paraffin test to both defendants on July 13, 1936, two days after the crime was committed; that both gave a positive reaction, which showed that they had fired or that their hands had been very near a firearm when it was discharged; that Ramón Ruiz showed a large spot on the middle finger, which revealed without any doubt that he had shot a firearm.

Antonio Colón Sierra, brother-in-law of the defendant Ruiz and the lover of Piazza's mother, identified the revolver as the property of Ruiz, and testified that he had never seen a revolver on Piazza; that the latter did not have money to buy firearms; that Ruiz requested him to get a lawyer to defend Piazza, and that he accompanied him to see Attorney Agustín Font; that at that time Piazza had been already arrested and Ruiz was under vigilance; that in his presence Ruiz gave to Attorney Font a check for $100 for Piazza's defense; that there had been personal quarrels between Pedro Serrano and Ramón Ruiz; that Pedro Serrano and Piazza were like brothers; that Ramón Ruiz was sick for some days in the hospital which he left on that Saturday, and during the night of that day the crime was committed.

Guillermo Levy testified: that he is ten years old; that he has been to school and that he knows how to read and write; that he knows Ruiz and Piazza and that he knew the deceased; that he saw who killed Pedro Serrano, and that it was Moncho Ruiz, the defendant; that he was coming with Serrano and Serrano was going up to turn to the San Juan Alley; that he followed through the alley, and when Serrano arrived, the witness was washing his feet under the water faucet which is about five meters from Ramón Ruiz's house; that Ruiz came out of the gate in his underclothes and shot Serrano through his right side, wounding him on his right temple; that Ruiz fired at Serrano at the moment he was knocking at his door; that at the moment of the shot he did not see Piazza there, who came later; that he saw and heard Ruiz when he gave the revolver to Piazza and said to him: "Run and throw it away, and tell them that you did it and give yourself up"; that he saw when Serrano fell wounded and when Piazza arrived Serrano had already fallen down and was dying opening and closing his eyes; that after taking the revolver, Piazza went into the store and went uptown; that he knows that it is bad to

accuse a person of having killed another; that he is sure that Ruiz was the one who killed Serrano because he saw it with his own eyes; that Miguel Ruiz, brother of the defendant, took him to the office of Attorney Font and he made an offer so that he would testify in a different way than he had done before the district attorney; that Miguel Ruiz bought him a suit of clothes; that in Font's office he was taken to a room where there was a shield with revolvers and daggers, and a skull; that Font said: ''That he should write a letter . . .'' but that it should not be written there; that Font refused to take his sworn statement; that Miguel Ruiz took him to his house and that at 7:00 o'clock he came with a bottle of wine mixed with rum and that he gave him to drink and offered him for his testimony, half of The Gruta, a victrola, six dollars, clothes and shoes; that for a time he lunched and dined at The Gruta until he met District Attorney Pierluisi; that The Gruta is owned by the defendant; that before the trial, Miguel Ruiz wanted to send him to other town, and that the district attorney took him to his house; that what he testified before District Attorney Pérez Marchand was the truth and that it is the same as what he testifies now before the jury. The witness was submitted to a strong and lengthy cross-examination and he ratified his statement in all its details and when asked by the district attorney if he had any interest in that one of the defendants or both be punished, he answered: ''That Moncho Ruiz be punished because he was the one who killed.''

Humberto Alvarez testified: that accompanied by Miguel Ruiz, he took the boy Guillermo Levy to the office of the Attorney Font and left him there with Miguel Ruiz and Mrs. Peña; that he was there when Miguel Ruiz compelled the boy to write a letter saying that Ramón Ruiz was not the one who had killed; that the letter was dictated by Miguel Ruiz; that he saw when they gave the boy a quart of wine to drink; that he did not hear offers made to the boy.

Eugenia Peña, wife of Humberto Alvarez, corroborated in all its parts the testimony of her husband and of Guillermo* Levy.

Carlos Ramis, Prison Guard, testified that the night of the events, while he was on duty, Maximino Piazza appeared there; that when he asked: "What is the matter with you?", Piazza answered: "That a relative was killed and I want to tell him", referring to an uncle of his, a prison guard; that later he said that he was the one who had killed; that he noticed that Piazza had imbibed liquor because he said one thing first and then another.

The evidence for the defendant:

Detectives Luis Modesti and Pablo Díaz Casiano, testified in relation to the investigation carried out by them when they knew about Serrano's death and about the statements made by Piazza, that he was the one who had killed Serrano.

The defendant Maximino Piazza testified: that in the night of the events he was at a dance up to ten; that he was drunk; that when he reached the San Juan Alley he heard a shot, turned around and when he arrived he found Serrano dead; that then Ramón Ruiz called him and said: "Maximino, come here, look, I have been operated; I have eight children; you have to be grateful to me, and you have to prove it to me"; that he asked: "How do you want me to prove it to you?" and Ruiz answered: "Take this revolver and go and surrender yourself"; that as he was drunk, he did as he was told; that when he arrived at the road to "El Vigía", he fired the revolver, and that then Anacleto Vélez appeared and took the revolver away from him; that he was drunk and that when he awoke he found himself in jail; that when he came out under bail, Anacleto gave him the revolver and told him: "Take this, it was sent by Ramón, I gave it back to him and he said to me no, because they would find it, and so on"; that Pedro Serrano was like a brother to him, and that they never had any quarrel; that Ramón Ruiz, the defendant, and Pedro Serrano, the deceased,

had an argument about a store; that when he arrived at the place of the events after the shooting, Ramón Ruiz was in front of the door of the house with Anacleto, who apparently held the door open for him, because he entered and immediately called me up; that Anacleto lived with Ruiz and then he tried to commit suicide when he was summoned as witness; that Ramón Ruiz was the one who bailed him out and paid the attorney's fees; that he said that the opportunity to tell the truth would come the day of the trial; that if he lent himself to say that he was the killer it was because he was drunk and that if he would have known that the deceased was Pedro Serrano, who was like a brother to him, he would never have done it; that when he arrived at the place he did not know who the victim was and that Ruiz did not tell him; that Ruiz was trembling, in pajamas and socks.

Testifying in his defense, the defendant appellant made a long account tending to show that he is the victim of a conspiracy among the witnesses for the prosecution to extort money from him.

Ex-district Attorney Pérez Marchand testified on rebuttal, explaining how the boy Guillermo Levy and Piazza had told him what they knew about the crime, in the same way that they testified it before the jury. The last one to testify, Josefa Rosado, mother of the deceased, said: that his son and the defendant Ramón Ruiz had had an argument over a store and an attachment and that they had quarrelled for money that Serrano claimed from Ruiz; that she was related to Ruiz; that the day Ruiz left the hospital, about 2:00 P. M., while she was seated next to the bed of Ruiz, in his establishment, he asked her if Serrano was still with his things and ideas; that she answered that Serrano was without a job and worthy of pity since Ruiz attached the store, to which Ruiz answered: "Josefa, what you say may be true, but if Pedro does not mend his ways, I will be forced to act"; that after saying this, Ruiz got up and went to

his house in San Juan Alley; that about 9:00 o'clock in the evening his son arrived, asked for her, and said good-bye until the following day; that about 10 o'clock her nephew came to tell her the news of his death; that Maximino Piazza and his son were always intimate friends.

All this evidence, with its contradictions and conflicts, was submitted to the jury, judges of the facts, and the only ones authorized by law to appraise the evidence and to pass over the credibility of the witnesses. The evidence for the prosecution, to which the jury gave full credit, is in our opinion sufficient to sustain and justify the verdict and the judgment appealed from, which must be affirmed.

Mr. Justice Todd, Jr., took no part in the decision of this case.